**WHIRLPOOL CORPORATION,**
Petitioner/Cross–
Respondent,

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent/Cross–
Petitioner.**

Nos. 02–1946, 02–2121.

United States Court of Appeals,
Sixth Circuit.

Feb. 20, 2004.

 

Frederick L. Schwartz, Adam C. Wit, Littler, Mendelson, Chicago, IL, for Petitioner.

David Seid, Office of the General Counsel, Frederick C. Havard, Washington, DC, for Respondent.

Before MARTIN and MOORE, Circuit Judges, and MCKEAGUE,* District Judge.

## OPINION

MOORE, Circuit Judge.

Whirlpool Corporation ("Whirlpool") petitions for review of an adverse Order and Decision of the National Labor Relations Board ("NLRB" or "Board"). The NLRB cross-petitions for enforcement of the Order. The NLRB found that three incidents stemming from a union election at Whirlpool's Findlay, Ohio manufacturing plant constituted violations of the National Labor Relations Act ("NLRA" or "Act"), and Whirlpool challenges each of those findings as a mischaracterization of undisputed facts or as inconsistent with prior cases. Because we conclude that the NLRB's findings were supported by substantial evidence and each apparent departure from prior precedent was adequately justified, we DENY Whirlpool's petition for review and GRANT the NLRB's cross-petition for enforcement of its Order.

## I. BACKGROUND

Whirlpool's Findlay plant has been without union representation for over 20 years; around June 1996, the United Steelworkers Union, part of the AFL–CIO, undertook an organizing campaign at the plant. In October 1996, the Union filed charges alleging that Whirlpool had violated

---

* The Honorable David W. McKeague, United States District Judge for the Western District of Michigan, sitting by designation.

§ 8(a)(1) & (3) of the NLRA, 29 U.S.C. § 158(a)(1) & (3), prohibiting interference with, restraint of, or coercion of employees exercising labor rights, or discrimination in regard to any term or condition of employment to discourage membership in any labor organization. These charges were later amended on June 25, 1997, after the union had lost an election held on December 13, 1996. Six violations were alleged; three were found by the ALJ.

On November 13, 1996, John Trice ("Trice"), a longtime employee of the plant who identified himself as a union supporter, was passing out union literature with about six to eight other employees outside the plant, but on company property, at about 5:10 a.m. After ten to fifteen minutes, the group was asked by a company security guard when their shifts started; Trice responded for the group that they began at 6:30 a.m. The guard responded that employees were not allowed on company property until fifteen minutes before their shifts began. Trice told the guard that the rule had never been enforced. The guard left. Ten minutes later, Dick Kretz ("Kretz"), a third-shift supervisor, approached the group and told them they were not allowed to distribute literature on company property. Trice told Kretz that they could legally do so, and suggested that Kretz study the law on the subject. Kretz said he would and left; some time later, he approached Sandy Franks ("Franks"), then-manager of employee services, part of Whirlpool's human resources department, and asked her about the incident. Franks told Kretz that the employees were legally entitled to distribute literature on company property in nonwork areas when they were not working. Trice and his group were never prevented from distributing literature, and he was not disciplined for this incident.

On October 3, 1996, David Hamilton ("Hamilton"), a Whirlpool employee who became involved in the union campaign, was called to the office of his immediate supervisor, Lee Beck ("Beck"). Beck, Kretz, and Steve Dearth, the third-shift supervisor, met with Hamilton, and Kretz informed Hamilton that he had been accused of harassing someone through "verbal harassment, 'intimidation,' and talking about the Union during worktime." Joint Appendix ("J.A.") at 19. Kretz refused to identify Hamilton's accusers; Hamilton was told that the incident would be documented on his "yellow card," which he was asked to sign, but Hamilton would not do so because Kretz had not identified the complainants. A yellow card is a record of an employee's attendance/tardiness and conduct, maintained by the employee's supervisor throughout her employment by Whirlpool, and is transferred from supervisor to supervisor as the employee is assigned and reassigned; it is not necessarily kept in the employee's personnel file, however. Kretz told Hamilton he could contact Steven Traucht ("Traucht") in the human relations department with any questions he had about the counseling; Hamilton attempted to do so, but Traucht never returned his calls until just prior to the NLRB hearing. This counseling session, according to Beck, was sparked by the complaints of two employees identified by Beck as Bonnie Ellerbrock and Sandy Mansfield, who did not testify at the hearing before the ALJ.

On October 10, 1996, a similar counseling of Jerry Pore ("Pore"), one of the original union organizers among the Whirlpool employees, took place. Pore was called to the front office by Monte Sampson ("Sampson") and counseled by Sampson and Michelle Obenour about complaints stemming from his solicitation for the union on company time. This counseling was again allegedly prompted by com-

plaints from Pore's fellow employees William Bowling, Murl Phelps, and David Pierce. The counseling session was written up on Pore's yellow card, but Pore was not apparently asked to sign the entry.

The ALJ found on August 9, 2000 that the November 13 incident was a violation of § 8(a)(1) of the NLRA, and that the October 3 and 10 incidents were violations of § 8(a)(3) of the NLRA. Whirlpool took exception to each finding of a violation and to the issuance of a remedial order to correct the § 8(a)(1) violation, even if such violation existed. The NLRB ruled on those exceptions on July 5, 2002, affirming the ALJ's decision in all respects, but modifying its Order in line with intervening NLRB decisions, modifications not at issue here. One member of the three-member panel dissented from the issuance of a remedial order to correct the § 8(a)(1) violation, but agreed that a violation had taken place. On August 6, 2002, Whirlpool submitted a petition for review of the NLRB's order, a petition it has supported with the same claims of error submitted to the NLRB.

## II. ANALYSIS

### A. Standard of Review

We will uphold the Board's findings of fact as long as they are supported by substantial evidence in the record as a whole. *See Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456 (1951); *NLRB v. Talsol Corp.,* 155 F.3d 785, 793 (6th Cir.1998). We also review the NLRB's application of law to particular facts under the substantial evidence standard. *See Talsol Corp.,* 155 F.3d at 793. We review de novo the NLRB's conclusions of law, but where the NLRB interprets the NLRA, that statutory interpretation, if reasonable, is entitled to deference. *See Chevron U.S.A. Inc. v. Natural Res. Defense Council, Inc.,* 467

U.S. 837, 865–66, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); *NLRB v. Main Street Terrace Care Ctr.,* 218 F.3d 531, 537 (6th Cir.2000).

### B. November 13th Incident

■ Whirlpool's main argument regarding the November 13th incident, when Kretz told Trice he was unable to distribute literature, is that because Trice continued to distribute literature, we can conclude that Kretz's statement had no effect and therefore should not have been found to be a violation of the Act. Whirlpool first points to the Board's decision in *Nice–Pak Products, Inc. v. Intern. Union,* 248 N.L.R.B. 1278, 1980 WL 11488 (1980), where the NLRB found that a similar incident did not amount to coercion in violation of § 8(a)(1). In *Nice–Pak,* after the supervisor mistakenly informed the employee that distribution of union literature was prohibited, he apologized for his mistake, and that apology was found to have effectively nullified the violation. Whirlpool argues that because Kretz's statement had no detrimental effect on Trice's distribution of literature, the same circumstances that were found to have sufficed to nullify the violation in *Nice–Pak* are present here. The NLRB responds that in the instant case, there is no triggering event, such as an apology or rescission of Kretz's statement. In *Nice–Pak,* the fact that the violation was shown not to have affected employees' substantial rights was not important in and of itself, but only as a measure of how effective the supervisor's apology had been. The absence of an apology in the instant case was relied upon by the ALJ to differentiate it from *Nice–Pak;* the ALJ also remarked on the possible chilling effect Kretz's statement may have had on other employees. We find that distinction a reasonable reading of *Nice–Pak,* supported by substantial evi-

dence. In *Nice–Pak,* the ALJ clearly found a violation would have occurred in the absence of the apology; here, where no apology was made, the Board cannot be faulted for finding a violation.

Next Whirlpool argues that even were a violation properly found, that "violation would have been so isolated and trivial so as to warrant dismissing the Complaint." Pet'r's Br. at 33. For this proposition, Whirlpool relies on *American Federation of Musicians, Local 76 (Jimmy Wakely Show),* 202 N.L.R.B. 620, 1973 WL 12195 (1973), in which the Board refused to find a violation or issue a remedial order in the face of an isolated, remedied, technical violation of the Act. In *Jimmy Wakely,* the Board refused to find a violation or to issue a remedial order. However, *International Union United Auto Workers v. NLRB,* 427 F.2d 1330, 1332–340 (6th Cir. 1970), requires in this circuit that the Board issue a remedial order whenever it finds a violation, no matter how insignificant. Therefore, Whirlpool can only argue that the NLRB erred in making a formal finding of a violation even though Whirlpool's conduct is technically prohibited by the Act. In the instant case, the Board distinguished *Jimmy Wakely,* over dissent from Chairman Hurtgen, by noting that in *Jimmy Wakely,* a single violation was alleged and found, versus the numerous violations alleged in this case and the three found. They found that this violation was therefore "part of a pattern of unlawful conduct that was litigated and adjudicated." J.A. at 35. This factual distinction is supported by substantial evidence.

## C. Disciplining of Pore and Hamilton

### 1. Finding that the Counseling Sessions Were Discipline

■ Whirlpool first challenges the Board's finding that the counseling received by Pore and Hamilton constituted disciplinary action such that it affected a "term or condition" of employment under § 8(a)(3). This is perhaps the most troubling aspect of the NLRB's decision, as a 1993 Board case reviewed an almost identical factual situation and came to the exact opposite conclusion. *See Lancaster Fairfield Cmty. Hosp.,* 311 N.L.R.B. 401, 403–04, 408–09, 1993 WL 186113 (1993). In that case, the Board reversed an ALJ's finding of discipline where an employee had received a "Conference Report" in lieu of "disciplinary action in the form of an oral reminder." *Id.* at 403. In the instant case, the ALJ stated that "the facts here are clearly distinguishable from those of *Lancaster Fairfield Community Hospital,*" relying upon two distinctions: first, that "the counseling session memorialized by the yellow card clearly corresponds to the first step of the Respondent's formal disciplinary process and procedures," and "[s]econd, and probably most important for my determination, the yellow card entry, unlike the conference report in *Lancaster Fairfield Community,* can serve as a predicate for future adverse action against the employee." J.A. at 23. However, a careful review of the Board's decision in *Lancaster Fairfield Community Hospital* reveals that the Conference Report at issue in that case could in fact serve as a predicate for future adverse action. While it seems clear that the ALJ's reading of past case law in this respect was erroneous, and perhaps if he had read it correctly, he might have reached a different conclusion, the independent ground offered in support of his decision—that the counseling sessions corresponded to the first step of the formal disciplinary process outlined in the employee handbook—is supported by substantial evidence, and therefore can serve as an adequate distinction between the two cases. Whirlpool's reliance on the testimony of its management that the counseling

sessions were not the type outlined in the handbook is unavailing in the face of the ALJ's decision not to credit that testimony.

### 2. Due Process

Whirlpool argues that its due process rights were violated because the complaint initially issued against it alleged discriminatory discipline of Pore and Hamilton, while the ALJ relied instead "on his finding that Whirlpool had failed to establish an 'honest belief' surrounding the reason for the counseling." Pet'r's Br. at 43. However, once a prima facie case of illegitimate motive has been made out by the General Counsel, the Respondent bears the burden of demonstrating that it acted for lawful reasons, under *Wright Line*, 251 N.L.R.B. 1083, 1089, 1980 WL 12312 (1980). *Wright Line* applies generally to all § 8(a)(3) violations, which is precisely what was alleged in the complaint; once a § 8(a)(3) violation was alleged, Whirlpool was on notice that it would bear the burden of proving lawful action. Since its defense was that it had received employee complaints, leading its supervisors to believe that Pore and Hamilton were guilty of rule infractions, it is difficult to see how the ALJ's reckoning of whether that belief was honest was surprising to Whirlpool, much less surprising enough to constitute a due process violation. When an employer asserts such a due process violation, we inquire whether the issue was fully and fairly litigated. *See Henry Bierce Co. v. NLRB,* 23 F.3d 1101, 1106–08 (6th Cir. 1994). Here, Whirlpool put on testimony from the counseling supervisors that they had received complaints from workers regarding Pore's solicitation and Hamilton's harassment, which has always been its defense to the alleged § 8(a)(3) violation. We therefore hold that even if the complaint contained inadequate notice of the "honest belief" issue, that issue was fully and fairly litigated before the ALJ.

### 3. Whirlpool's Burden of Proof Under *Wright Line*

Finally, Whirlpool argues that the Board erred in affirming the ALJ's decision because it met its burden under *Wright Line* of demonstrating that it would have taken the same action against the employees in the absence of protected activity. *See NLRB v. Gen. Sec. Servs. Corp.,* 162 F.3d 437, 444–45 (6th Cir.1998). With regard to Hamilton's discipline, Whirlpool asserts that the Board erred in relying on the supervisor's mention of the union because there was no other way "to caution Hamilton regarding employee complaints about his aggressive union activities without mentioning those same activities," Pet'r's Br. at 47; that the Board erred in drawing a negative inference with regard to the failure of the complaining employees to testify; and that the Board erred in concluding that the factual record was inadequate with regard to Hamilton's ostensibly offensive behavior. With regard to Pore, Whirlpool asserts that it was error for the Board and the ALJ to rely upon Pore's denial of the behavior for which he was ostensibly disciplined.

The NLRB in turn emphasizes that once the General Counsel has established a prima facie case that the union activity was a motive for the disciplinary action in question – a prima facie case that goes unchallenged by Whirlpool before this court – the burden shifts to the respondent to prove by a preponderance of the evidence that it would have taken that action in the absence of union activity. With regard to Hamilton, the NLRB asserts as deficiencies in Whirlpool's proof the lack of detailed testimony as to the specifics of the alleged malfeasance, adverting specifically to Whirlpool's failure to call as witnesses

the complaining employees and two of the three supervisors responsible for disciplining Hamilton, and Whirlpool's failure to investigate the alleged harassment despite its obligation to do so under established company procedure. Whirlpool relies on *Adair Standish Corp. v. NLRB*, 912 F.2d 854, 862 (6th Cir.1990), where this court granted enforcement to an NLRB decision that relied partially on an employer's failure to substantiate its claim by producing complete evidence in deciding that the employer had not met its *Wright Line* burden. Whirlpool also cites *ITT Automotive v. NLRB*, 188 F.3d 375, 388 (6th Cir.1999), where similarly the NLRB's reliance on an employer's failure to investigate malfeasance according to usual procedure was ratified by this court.

Ultimately, Whirlpool's objections with respect to Hamilton are essentially an attempt to reassert in this court the claims that failed below; substantial evidence on the whole supports the NLRB's decision that Whirlpool failed to meet its burden where it did not proffer testimony adequate to demonstrate its legitimate reason for the counselings.[1] Whirlpool also asserts that the NLRB is departing from its previous cases without giving a reasoned basis for that departure. Whirlpool points again to *Lancaster Fairfield Community Hospital*, where the NLRB found that the ALJ had improperly ruled that a certain portion of a written warning was motivated by anti-union animus. Instead, the Board found that "[r]espondent had a reasonable basis for believing [an employee's] claim that she had been harassed and intimidated by [the disciplined employee]." *Lancaster*, 311 N.L.R.B. at 405. But in *Lan-*

*caster*, the complaining employee testified before the ALJ as to the specific date, time, and circumstances of the incident, as well as the complaint she made, and other witnesses testified to specific circumstances surrounding the incident. *See id.* at 410–411. No such testimony took place here, and the NLRB did not err in deciding that Whirlpool failed to carry its *Wright Line* burden with respect to Hamilton's counseling.

The three differences between Hamilton's and Pore's counselings all cut against finding that Whirlpool met its burden with respect to Pore where it did not with respect to Hamilton: Pore made a credited denial that the solicitation in question took place; his supervisor went so far as to fill out Pore's yellow card before the meeting with Pore took place; and Whirlpool had allowed fundraising and other solicitations on the plant floor in the past. (Pore was accused of solicitation, Hamilton of harassment). Therefore, since substantial evidence supported the NLRB's decision that Hamilton's counseling was motivated by anti-union animus, it certainly supported that decision with respect to Pore.

## III. CONCLUSION

We therefore **DENY** Whirlpool's petition for review and **GRANT** the NLRB's cross-petition for enforcement of its Order.

McKEAGUE, District Judge, concurring in the judgment.

While I concur with the judgment reached in the majority opinion, I write separately to highlight why the Board's findings and application of law to particu-

---

1. Whirlpool asserts that a "negative inference" was improperly drawn against Whirlpool in regard to its failure to call the complaining employees, the witnesses in question; however, no negative inference as defined in the cases it cites was drawn against it. The ALJ did not presume that the uncalled witnesses would have testified adverse to Whirlpool's interests; instead, the ALJ found that Whirlpool had not met its burden, and specifically noted that had it wished to meet its burden, it could have called those witnesses.

lar facts are supported by substantial evidence in the record as a whole. Additionally, I write to note that the remedial order sought to be enforced and which will be enforced with this court's judgment is seemingly useless given the extensive delay that has occurred between the time the violations took place and now.

Though substantial evidence supports the Board's affirmance of the ALJ's finding that the counseling received by Pore and Hamilton constituted disciplinary action such that it affected a "term or condition" of employment under § 8(a)(3) of the NLRA, the ALJ did not simply fail to credit the testimony of Whirlpool's supervisors in reaching the conclusion that the counseling sessions memorialized by the yellow cards correspond to the first step of Whirlpool's formal disciplinary process and procedures as the majority concludes.

As the majority notes, the ALJ relied upon two distinctions in distinguishing the facts in this case from those of *Lancaster Fairfield Community Hospital.* First, the ALJ noted that the policy guidelines contained in the employee handbook corresponded to the first step of Whirlpool's formal disciplinary process and procedure. In reaching this conclusion, the ALJ relied primarily on the fact that the employee handbook did not allow for distinctions between formal and informal counseling. Instead, the handbook simply listed six penalties that may be undertaken if a violation occurs. One of these penalties included counseling by the employee's supervisor, the very counseling at issue in this case. Thus, while the ALJ did note in a footnote that a supervisor's testimony provided support for Whirlpool's position that counseling sessions and the yellow card entry procedure corresponded to informal discipline, the ALJ simply concluded that the language of the employee handbook

was more persuasive than the testimony provided by a supervisor.

Additionally, the ALJ, in outlining the second, and as the majority notes, erroneous distinction between the facts of *Lancaster Fairfield Community Hospital* and the facts of this case, relied on the conflicting testimony provided by Whirlpool's supervisors. While the ALJ used this testimony to buttress the conclusion that the yellow card entry could serve as a predicate for future adverse action, some of the testimony also appears to provide support for the ALJ's position that the notation of counseling on the yellow card corresponds to the progressive disciplinary policy as set out in the employee handbook. For instance, the ALJ discussed the testimony of a supervisor from Whirlpool who indicated that the notation of counseling was kept on the yellow card in the event there was an escalation of the conduct. The ALJ concluded in a footnote that this testimony, describing the consequences of the counseling, was consonant with Whirlpool's established progressive disciplinary process as set out in the handbook.

Finally, although the supervisors testified that the counseling memorialized by the yellow card entry constituted only informal rather than formal discipline, Whirlpool fails to provide a basis for its claim that both formal and informal disciplinary procedures exist at Whirlpool and the actions here involved only a type of informal discipline not covered by the handbook. While the ALJ could certainly have provided a clearer explanation as to why it placed greater reliance on the employee handbook than on the testimony of the supervisors in determining that the counseling sessions corresponded to the first step of the formal disciplinary process, the ALJ's determination is supported by substantial evidence as found in the disciplinary system outlined in the employ-

ee handbook, testimony from some of the supervisors, and Whirlpool's failure to sufficiently establish the existence of an informal discipline system distinct from that outlined in the handbook. If the ALJ had completely failed to credit the testimony of Whirlpool's supervisors and if Whirlpool had provided an adequate basis for its position, it might be arguable whether substantial evidence supported the ALJ's decision and the Board's affirmance of that decision, given that the ALJ relied primarily on an erroneous interpretation of *Lancaster Fairfield Community Hospital,* a case with substantially identical facts to this case, to reach an opposite conclusion.

Because substantial evidence supports the ALJ's finding that the counseling of Pore and Hamilton constituted impermissible disciplinary action in violation of the Act, however, I reluctantly agree that the November 13th incident in which an employee was told that he could not distribute union literature also constitutes a violation of the Act. While this *de minimus* violation, in isolation, would not result in a violation of the Act, the November 13th incident, coupled with the disciplining of Pore and Hamilton, does support the Board's finding of a pattern of unlawful conduct and thus establish a violation of the Act.

However, while precedent and substantial evidence would dictate upholding the Board's findings in this case and granting the cross-petition for enforcement of the remedial order, use of the court's authority to enforce a remedial order at this date seems largely indefensible when the purported purpose of such an order is to remedy a technical *de minimus* violation that occurred more than six years earlier. This is especially true when the delay between the time when the violations occurred and this decision is attributable largely to the NLRB. The court may have reached the correct judgment in this case but the result, at least with respect to the November 13th incident, seems pointless.